33  525
34a 190

R. C. MYERS AND OTHERS v. THE STATE.

1. When the evidence on a trial for murder was such that the only legal conclusion must be either justifiable homicide or murder in the first or second degree, it was not error for the judge below to omit any instruction to the jury on the law of manslaughter.

2. An alleged want of jurisdiction in the district court, of a criminal cause, is not otherwise available to a defendant than by special plea, under oath, at the time of the trial; and it seems that the plea of "not guilty" does not, under our laws, put in issue the question whether the offense was committed in the county where the indictment was found. Articles 2944, 2951 and 3137, Paschal's Digest, cited by the court. (Since overruled; see Reporter's note below).

3. Therefore, although the transcript of a conviction in a criminal cause contains no evidence whatever of the locality or county where the offense was committed, yet this court cannot disturb the conviction on the ground of a want of jurisdiction in the district court, or because of a failure to prove the venue, unless the defendant had put those facts in issue in the district court, by a special plea under oath. (Since overruled; see Reporter's note below.)

4. The above rulings, on the questions of jurisdiction and venue, are admitted to be in conflict with former decisions of this court, which appear to have been founded on misconception of the provisions of the Criminal Code.

5. The provisions of the Criminal Code of this State are not to be construed strictly, as is commonly but mistakenly argued—they are to be construed "in accordance with the plain import" of their language, and without reference to any distinction between penal and other laws, as is expressly enjoined by Article 1611, Paschal's Digest. In doubtful cases, however, precedent and former adjudications should have great weight with all courts.

6. Though the Criminal Code (Paschal's Digest, Article 2270,) is explicit that a party accused of murder may justify the homicide by proof of threats against his own life by the party slain, coupled with some act of the latter at the time of the homicide, manifesting an intention to execute the threat made—yet the rule which controls the mode of introducing proof of such threats is left by the code to be settled by the principles of the common law.

Statement of the case.

7. The threat which will justify a homicide must be an actual threat by the slain party to take the life of the slayer, and such threat must have been brought directly to the knowledge of the slayer; and, moreover, it must be unequivocally shown that, at the time of the killing, the party slain was doing some act which demonstrated his intention to carry the threat into execution.

8. Expressions of an opinion by the party slain that the accused was pursuing a line of conduct which would endanger or cost him his life, cannot be considered threats against the life of the accused; and it was not error to exclude from the jury testimony offered by the accused to prove such expressions, and that they had been communicated to him.

9. Mr. Justice Denison concurs in the foregoing rulings, but dissents from the affirmance of the judgment, on the ground that there was error in another ruling of the court below, not adverted to in the opinion of the majority.

[NOTE BY THE REPORTER.—At the ensuing term of this court, in the case of Field v. The State, decided in February, 1871, and not yet reported, the rulings in the present case respecting the "venue of the offense," were expressly overruled.]

APPEAL from Brazos. Tried below before the Hon. George R. Scott.

Robert C. Myers, George W. Hardy and David Myers are the appellants in this case. At the Spring term, 1870, of the District Court of Brazos county, they were jointly indicted for the murder of William H. Millican, alleged to have been committed on the sixth of February, 1870. They pleaded not guilty and were jointly tried at the same term, the jury finding them guilty of murder in the second degree, and assessing their punishment at six years confinement at hard labor in the penitentiary.

In the statement of facts there is no testimony that the town of Millican, where the killing occurred, was in the county of Brazos; and from this omission in the proof arose the questions of jurisdiction and venue, ably argued and strongly urged by the counsel of the appellants in this court.

The other questions adjudicated in this cause arose out of the

rulings of the court below upon evidence offered by the defendants ; wherefore it becomes necessary to recapitulate the material facts underlying the rulings of this court.

The killing took place on the evening of Sunday, the sixth of February, 1870, in a "saloon" kept by Robert C. Myers in the town of Millican. Whatever evidence of antecedent ill will between the parties may be implied in the facts of the case, there had been no quarreling nor previous conflict. The circumstances immediately attendant upon the killing were thus stated by H. A. Long, the first witness for the State :

On the sixth of February, 1870, witness was living with R. C. Myers, and was acquainted with Millican, the deceased. About six o'clock, P. M., of that day, Millican came into Myers's saloon, saying " good evening gentlemen." R. C. Myers, G. W. Hardy and David Myers were in the saloon, but they made no reply to Millican's salutation. Millican walked in and passed along the side of the counter, when R. C. Myers fired two shots in quick succession, one taking effect in the side of the deceased, the other in his back. The gun used by Myers was a double-barrel shot gun. Witness was in the saloon when Millican entered it; he wore on that night a heavy black overcoat. The house was kept as a drinking saloon by R. C. Myers; witness had seen Millican come into it often, and sometimes as late as nine o'clock at night. Drinking water was kept at or near the end of the counter towards which Millican was walking when shot by Myers. Deceased frequently came into the saloon and got a drink of water. After the second shot, witness ran out and reported that Millican was shot, and got one Martin to return with him to the saloon. When they got there the defendants were all gone, and Millican was lying on his face on the floor, dead. Martin raised the deceased's overcoat to see how he was shot, and found a six-shooter lying on the floor under him. The deceased did not have on any pistol belt or scabbard. When Millican came into the saloon, Allen

Myers was following close after him, and before R. C. Myers shot he called to Allen to get out of the way, and when Millican was shot he cried out "murder." Witness had been in the saloon about fifteen minutes before Millican came in.

On cross-examination, the witness stated that Millican had his overcoat buttoned up around his neck and face. The gun used by Myers had been standing for weeks in the place from which Myers's took it. On re-examination, he stated that he did not see Myers pick up the gun; only supposed he picked it up after Millican entered the saloon.

This testimony shows substantially what occurred at the time of the killing. The controverted questions, however, arise out of other and antecedent circumstances.

T. C. Woodlief, a witness for the State, on examination in chief, testified that about four o'clock in the afternoon of the day on which the killing took place, R. C. Myers went to witness's house in Millican, under great agitation and excitement, and entered one of the rooms and commenced loading a gun. On cross-examination, the defense asked the witness what was said by Myers at that time explanatory of his excitement and purpose, but the State obected, and the court sustained the objection, and the witness was not permitted to state the declarations made by Myers, to which the defendants duly excepted.

The defendants introduced Leander Cannon, who testified that about noon on the day of the killing, the deceased applied to witness for the loan of a pistol, and witness told him his pistol was at home. In the conversation which ensued, the deceased said to witness that old Robert Myers was taking a good deal of dish in ferreting out the hanging of that negro, and he would have to kill him to get him out of the way. This testimony was objected to by the State, on the ground that these statements of the deceased were not shown to have been committed to Myers or any one else by the witness, before the homicide. The objection was sustained, the evidence ruled out, and the defendants excepted.

W. L. Abbott, for the defendants, says, about four o'clock in the evening of the homicide, he informed R. C. Myers that there was a plot to assassinate him, Myers; that he, the witness, expected on coming to town that morning to have found him murdered; that Myers asked him what he should do to avoid assassination, and witness told him to keep in the dark and away from the windows, and to send feelers ahead of him in passing between his residence and his grocery. Defendants also proposed to prove by this witness that great consternation and excitement were produced in Myers's mind by this information and advice of the witness. But on objection of the State, this testimony of Abbott was excluded, and the defendants excepted. This same witness, however, was allowed to testify that about three or four o'clock in the afternoon of the day of the killing, he found R. C. Myers and Hardy together; that he, witness, called Myers to one side and told him he had a secret to communicate to him, and informed him that on the day previous Millican had told witness that Myers was trying to get the military to come to the town of Millican, to investigate the hanging of that negro, and he, Millican, would not be in Myers's boots for $100,000; that he would be shot all to pieces, or they would shoot him all to pieces, and that his old hide would not hold shucks. The witness further stated that Myers appeared to be greatly excited by the communication.

H. P. Edwards, witness for defendants, testified that he had a conversation with Millican on the day before the killing, in which Millican told the witness he had better be careful how he talked before R. C. Myers, because Myers was trying to ferret out the hanging of that negro, and he would not be in Myers's shoes for $10,000; and witness told this to Myers in the back room of his saloon. But further statements of this witness, to the effect that he advised Myers that his life was in danger, etc., were excluded on objection of the State; and the defendants excepted.

The defendants further proposed examining Leander Cannon to

XXXIII—34

prove that while Millican kept the keys and had charge of the prison house in the town of Millican, a freedman was taken out of the prison house and hung; that Millican was implicated and engaged in the hanging; and that R. C. Myers was on the inquest upon the body of the negro, and condemned the act as murder, saying that the people should hold an indignation meeting. The State objected to such testimony, and it was excluded, the defendants again excepting to the ruling.

These several rulings of the court below, excluding proposed testimony for the defense, are those to which reference is made in the opinions delivered in this case.

As an important fact in the case, however, it is proper to state that by one Smith the defendants proved that Millican, the deceased, borrowed a six-shooter from the witness about sundown on the day of the killing, and the witness identified the pistol found under Millican's body as the same loaned him by witness. When Millican borrowed it he asked witness if it was sure fire, and witness told him it was.

Allen Myers, for the defense, testified that Millican walked into the saloon hurriedly; that he had a six-shooter in his right hand, holding it by his right side and rather behind him. This witness further stated that when Millican entered the saloon he "broke for behind the counter." Witness walked in close behind Millican, and saw R. C. Myers take up his gun, and heard him call out to witness to get out of the way, and then R. C. Myers fired on Millican, shooting off both barrels of his gun, one after the other.

Enough has been stated to disclose the important features of the case. The evidence implicating David Myers and G. W. Hardy consisted of assistance rendered by them to R. C. Myers in the way of procuring and preparing arms, etc., shortly before the killing.

The charge to the jury presented the case as one either of jus-

tifiable homicide on the one hand, or of murder in the first or second degree on the other.

*Davis & Beall*, for the appellants.—It will be perceived that the *locus in quo*, or the place where the offense is charged to have been committed, constitutes one of the essential facts to be proved, and without which neither the court nor jury have any jurisdiction. This we believe to be the well settled doctrine, both English and American, as shown by the authorities. (See Wiley W. Scott v. The State of Texas; Russel on Crimes, 800, 801; 3 Greenl. Evi., 15; Scott v. State Texas; Vance v. State Texas; Searcy v. State, 4 Tex. R., 450; Hightower v. State, 22 Tex. R., 605; Commonwealth v. Col, 21 Pick., 509.)

If the above be a correct exposition of the law, then this case must be reversed upon the fifteenth assignment of error, because the verdict of the jury is contrary to the evidence. The only pretence of proof of any venue whatever in the case, as disclosed by the record, is that of the witnesses, Britze and Smith, who testified that they resided in the town of Millican on the sixth of February, 1870.

Will it be seriously insisted that the proof of the homicide at "Millican" sustains the charge as laid in the indictment—that it was committed in "the county of Brazos and State of Texas?" We think not. The law is clearly settled the other way. In support of which we refer to 1 Chitty's Pl., 274, 277, where the principle is claimed that the place where the homicide is charged to have been committed, must be proved with particularity, as laid in the indictment, and especially as to the county; and if there should be a variance in the proof as to venue, and the allegations in the indictment, it would necessarily prove fatal to the verdict or judgment. That there results this discrepancy in the proof and charges of the indictment is apparent from the record. The charge in the indictment is, that the act of killing occurred in

Brazos county and the State of Texas, while the proof simply is, that it occurred at the town of Millican! What Millican, in what State or county? We appeal in vain to the evidence for an answer to our inquiry. And the jury who tried this case are to-day without a scintilla of evidence as to where the town of Millican is, and especially are they unable to say from the evidence in what particular town of Millican the deceased was killed. It may be insisted that this court judicially knows the local divisions of the State, with counties, cities, towns, and the like. We grant the proposition, so far as it extends to political government, but not as to their precise boundaries farther than they may be described in public statutes, (see Greenleaf Evi., 1 vol., p. 9 and note 1); and especially do we deny that this court can have judicial cognizance of the fact that the "Millican" in Brazos county, is the place where the homicide was committed. The court may know as a geographical or historical fact, that there is a town by that name in the county of Brazos; but, unless it was the county seat, it could have no judicial recognition whatever. At the common law, the courts would take judicial notice of the divisions of England into counties and provinces, but not of the sub-division into parishes, villes, and liberties, except the county seats, particular places, to which the process of the courts issued. (Archibold Crim. P. and P., 65, note 3; 1 Chit. P., 218–250; 2 Ad. & El., 789, N. S.; Andrews v. Hoxie, 5 Tex. R., 184; Kearney v. King, 18 Eng. Com. L. R., 28–31; Brunt v. Thompson, 42 Eng. Com. L. R., 913; Dybel's case, 6 Eng. Com. L. R., 468; 1 Brit. Cr. C., 144.)

The evidence of the acts and words of the deceased, as shown in the bill of exception to the exclusion of Cannon's testimony, was calculated to prove the intention of Millican to commit a felony, or not. It sought to delineate the whole affair, from the inception to the conclusion; to develop each feature and portray every emotion; to present it all for scrutiny and for judgment. The testimony was excluded, and we firmly believe that no principle of law

or rulings of the courts can be produced in aid of the rejection· of such· character of evidence. We did not offer the testimony of Cannon to prove threats in justification, but to show the *quo animo* of the deceased; and that this view of the admissibility of the evidence is correct and well founded, we refer to the following authorities: Reynolds v. State, 1 Kelley, 236; State v. Halstead, 220, 230, 237. In the latter case the learned judge, delivering .the opinion, said: "The question is, what excited the prisoner to the commission of the act? Everything which operated upon his mind ought to be proved." .That the evidence of the killing of the negro ought to have been admitted· is apparent from the consideration that it furnished a motive for Millican to wish to put Myers out of the way, and at the same time it furnishes a means or test by which to determine the degree of apprehension Myers felt when Millican entered his grocery about dusk, Sunday evening. (3 Stewart & ·Porter, 308, 315.) In this case the court say, "that if the circumstances of the killing were such as to leave any doubt as to whether he was not ·actuated more ·by the principle of self-preservation than that of malice, it would be proper to admit any testimony calculated to illustrate to the jury the motives by which he had been actuated." (The State v. Wright, 9 Yerger, 342; 1 Starkie Evi., 56, *et seq.*)

"A man may kill in defense of his person or property one who manifestly intends to commit a felony cn either, and he need not retreat," and previous conduct may be looked into to show grounds of suspicion. (Russel on Crimes, 549; 24 Com. L. R., 241; 24 Com. L. R., 335; 4 Mass. R., 392.) In this case the court "went into the evidence of the acts of the deceased several weeks prior to the killing." In support of the same principle of proving the intent, by acts and declarations antecedent to the killing, we quote Monroe v. The State, 5 Ga. R., 90; Howell v. State of Georgia, 5 Ga. R., 54. As to the error assigned upon the exclusion of the evidence of David R. Myers, there can be no

doubt. There the witness was permitted to prove the declaration of David Myers, when he asked for the gun, and was denied the privilege of stating the purpose. That part of the declaration which tended to inculpate the defendant, David Myers, was received, and the explanation was excluded. This evidence was clearly admissible under the operation of the *res gestae*, but more especially as it was only a part of what was said at the time. It is well settled as a rule of evidence that a part of a declaration cannot be taken, but the whole must be received and considered together. (See Jones & Jones v. The State, 13 Texas, 177; Lauder v. The State, 12 Texas, 468; 1 Greenleaf Evi., § 201.)

The court clearly erred in not, in its instructions to the jury, giving in charge the distinctions between the several degrees of murder in the first and second degree, and manslaughter. That the case ought to be reversed on account of this neglect upon the part of the court, it seems to us cannot be questioned under the evidence. The testimony of both Dr. Cunliff and Abbott is to the effect that Myers was thrown by the communication of the threats, into the greatest mental excitement; and this agitation was noticed as late as half-past five o'clock the day of the homicide, only about one hour before the death of Millican. And clearly, if Myers killed Millican under the immediate influence of sudden passion, it was either manslaughter or justifiable homicide. "The passion intended," says our Criminal Code, "is either of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection." (See Art. 2251 and 3.) We submit that there was evidence before the jury which showed a state of great mental agitation, and it was a question of fact for the jury to determine under a proper charge upon manslaughter, whether there was that reasonable fear which repels the conclusion of malice. In manslaughter there is no element of malice, and this is in consonance with the evidence, which proved a state of friendship on Myers's part up to the very

act of killing. In a case of doubt, under the evidence, as to whether it was perpetrated in malice, or from a principle of self preservation, it is proper that the jury should pass on the whole evidence and determine according to their convictions of the guilt or innocence of the prisoners, giving them the benefit of reasonable doubts. As to the effect of this testimony, that we are not compelled to show—for it lies exclusively within the province of the jury. They are the best and only legal judges of the testimony, and when there has been an improper rejection of testimony during the trial, a new trial will be ordered, though the court be satisfied that the verdict was correct. (State v. Peck, 2 Humph., 78; Whart's Am. Crim. L., 639; Hinton v. State, 24 Texas, 460; Maria v. State, 28 Texas R., 693; Atkinson v. State, 20 Texas R., 530; Villareal v. State, 26 Texas R., 107.)

*E. B. Turner*, Attorney General, for the State.—The facts are clearly sufficient to sustain the verdict. Implied malice arises from the unlawful killing, and the jury have passed upon that question.

Upon the point of venue I cite Paschal, § 2951, to show that the party must plead specially to the jurisdiction; Article 2965 to show that under general issue he cannot avail himself of matters which should be pleaded specially, and Article 2492 to show that he has waived the question. Further, there was proof as to where the killing took place, and it cannot be said that the jury found without or contrary to the evidence in regard to locality.

The proof was sufficient as to venue. (See 6 Yerger, 364; 10 Yerger, 550; 4 Mo., 455; 7 Mass., 12.)

*Hancock & West*, for the appellants, in reply.—We have searched the code in vain for this bold innovation on the ancient and well established rule, that the place where the offense was committed is of the substance of the indictment, and must be proved to be within the jurisdiction of the court trying the offense.

There is no article of the code expressly announcing this fundamental change, and two articles, article 2863 and article 2864, recognize the common law rule.

The form, however, of the objection, that the place where the offense was committed must be denied under oath by special plea, has led us to examine the provisions of our Code of Criminal Procedure on that subject.

Article 2951, Paschal's Digest, contains the only special pleas allowed, first, *auterfois convict;* second, *auterfois acquit;* third, that the court before whom he is prosecuted has no jurisdiction to try the cause. This plea is to be verified by affidavit, and the plea to the jurisdiction is to be tried by the court alone.

It certainly cannot be seriously contended that this provision relieves the State of the duty of proving the locality of the crime, or that it imposes the duty upon the defendant of denying the locality of the crime to be within the limits of the county where the indictment was found, under oath. How could it be done? Who would be hardy enough to advise his client to swear that the District Court of Brazos county had not the jurisdiction, the power to hear and determine an indictment for murder? And who dare risk his case on the question of place alone, when not guilty has always been declared to reach it?

The whole trouble and confusion (if indeed there is any) grows out of a total misconception of the two articles of the code, the one (Art. 2863) concerning the essential and issuable averments in an indictment, and the one (Art. 2951) stating what are the subjects of special pleas.

The second requisite in an indictment is that it must appear to be presented in a court having jurisdiction (that is, "the power to hear and determine the cause;" see Withers v. Patterson, 27 Texas, p. 494,) of the offense set forth.

The fifth requisite is one widely different, and is evidently confounded with the second, is "that the indictment must show that

the place where the offense was committed was within the jurisdiction [*i. e.*, within the boundaries of the county where the court sits] of the court," [that is the particular tribunal where the case is to be tried].

The case provided for in the Art. 2951, is where the court has no jurisdiction (*i. e.* power) at all to try the offense, whether committed within the limits of its territorial jurisdiction or not.    As if the District Court of Brazos county should find an indictment against the defendants for violations of the revenue laws of the United States, or the postoffice laws, or forging certain United States securities, or for any other act, for the commission of which district courts of the State have no authority to try one; or where a district court should attempt to entertain an indictment for the violation of the ordinances of some municipal corporation, or where a justice of the peace should attempt to try a party for rape, or for treason.    In short, that provision applies only to cases where the power of the court anywhere to try the offense is totally denied, and it is asserted that it has no jurisdiction; and it is provided as a response to the second requisite of the indictment, namely, that one relating to the general jurisdiction of the court, and not to the one which treats of the locality of the crime, and the territorial jurisdiction of the different district courts.

In the case at bar there is no pretense set up that there is a want of power or jurisdiction in the court trying the cause; the point is that the issuable fact as to the locality of the offense as alleged was not proved to be within the territorial cognizance of this particular district court, though it is conceded that the offense is within the general jurisdiction of the district courts, and hence the jurisdiction of the court could not be attacked by special plea.

In short, where the indictment, as in the case at bar, charges the defendant with an offense cognizable properly by the court in which the indictmennt is found, and avers the offense to be committed at a place within the limits of the county where the in-

dictment is found, the provision of the code concerning special pleas has no application to the case; where, however, the indictment upon its face alleges no offense at all of which the district court has jurisdiction, or while alleging an offense of which it has jurisdiction, alleges it to have occurred in a county different from that in which the indictment is found, then, in either of these cases the matter can be reached by special plea. But such a plea is wholly inapplicable to the case at bar.

In 1 Starkie's Criminal Pleadings, 2 ed., 310, 320, the author says: "By a plea to the jurisdiction, the defendant totally denies the authority of the court to try him. But it seems that the defendant cannot plead to an indictment before justices that the offense was committed at some place beyond their jurisdiction, for this would amount to no more than the general issue."

To exhibit still further how inapplicable this provision is to the case at bar, in order to plead it the defendant is forced to admit the homicide as charged, and also to state in what county he committed it, when in fact he denies *in toto* the commission of the homicide as charged, in any county, and by the plea of "not guilty" put in issue every essential averment in the indictment, among others the averment of the place as being within the territorial jurisdiction of the court. By article 2861 it is required that substantially all the requisites of the indictment shall be proved by the State, and the "place" is expressly declared to be one of the requisites.

This construction is in entire conformity with all the previous decisions of our court, as cited in the brief of our associates.

The court has uniformly, without a variation or shadow of turning, held the State must prove the place to be within the limits of the county where it is tried, and alleged to be committed.

In Hightower v. The State, 22 Texas, p. 607, Judge Bell observes: "There is no evidence that the offense was committed in the county of Johnson." In this case the defendant put in the plea of "not guilty."

LINDSAY, J.—The parties appellant in this cause were indicted in Brazos county for the murder of William H. Millican on the sixth day of February, one thousand eight hundred and seventy. A verdict of guilty was found by the jury upon the trial, against all the accused, and their punishment was assessed at confinement in the penitentiary of the State for a period of six years. Their appeal has brought the case to this court for revision upon numerous assignments of error, none of which appear from the transcript of the record to merit the special consideration of this court, except so far as those assignments of error call in question the rulings of the court in the exclusion of testimony offered by the defendants on the trial, and the implied and incidental error of the verdict of the jury from a supposed defect of evidence to sustain the jurisdiction of the court, under the venue as laid in the indictment. The charge of the court, upon the facts as presented in the record was full, complete, well considered, and contained the law applicable to the case; and a definition of manslaughter by the court was altogether unnecessary, because no other legal deduction could be made from the facts proved, than murder of the first or second degree, or justifiable homicide. The nature and character of their offenses were fully given in charge to the jury, and to the jury was properly left the determination of the class or predicament in this category into which the evidence placed these parties. To charge them that the facts as proved before them would warrant a conviction of manslaughter would have been palpably erroneous.

As to the question of the sufficiency of the proof to sustain the jurisdiction of the court as laid in the indictment, a brief analysis of a few articles of the Criminal Code will readily and satisfactorily dispose of it. Article 2949, Paschal's Digest, says that the only pleadings by a defendant in criminal cases are a motion to set aside the indictment; a *special plea*, setting forth the facts why he should not be tried upon it; an exception to it

for matter of form or substance; a plea of guilty; and a plea of not guilty. By Article 2951, Paschal's Digest, the only *special pleas* which a defendant can be heard to make are, that he has been before convicted legally in a court of competent jurisdiction, upon the same accusation, after having been tried upon the merits, for the same offense; or, that he has been acquitted by a jury of such accusation, in a court of competent jurisdiction, whether the acquittal was regular or irregular; *or, that the court before whom he is prosecuted has no jurisdiction to try the cause;* which special pleas, by Article 2952, must be verified by the affidavit of the defendant. This special plea to the jurisdiction contemplates only two things; either that the defendant is not the person to be indicted for the alleged offense, or if such offense has been committed at all by the defendant it was not committed within the local, or territorial jurisdiction of the court.

Then, if a party intended to avail himself of the want of jurisdiction of the court, he must do it by a *special plea* at the time of the trial.

This requirement is just as imperative as is the requirement of the tender of a bill of exceptions to any decision, opinion, order, or charge of the court, which the party may wish to have revised in this court. The object of this revision is the granting of a new trial. This court cannot authorize it, except for the same causes for which the district court trying the case might or should have granted it. These causes are all set forth in Article 3137, Paschal's Digest, none of which embrace the cause here relied upon, by the most remote implication. The ninth cause, in which the verdict may be alleged to be contrary to law and evidence, and in which alone it could possibly be embraced by implication, expressly precludes such an inference by providing that when a "defendant is found guilty of an offense of inferior grade to, but of the same nature as the offense proved, the verdict shall not be regarded as contrary to the law and the evidence within the meaning of the

provision." According to the criminal law of Texas, therefore, even if there were not a scintilla of evidence exhibited in the transcript of the record, of the precise locality, or the place where the offense was committed, the party could not avail himself of it here, unless he had put the fact in issue by *special plea* on the trial in the court below.

In the case of Perry Baker v. The State, decided at this term of the court, hastily acting upon what seemed to be a recognized rule by the courts of this State, it was adjudged that the failure of proof, without the plea, was sufficient to arrest the jurisdiction of the court trying the cause. That opinion, as well as all others containing a like recognition, the court is agreed, is not a correct exposition of the law of the criminal code. But in this case, this court thinks the evidence in the record does raise a violent presumption that the offense for which these prisoners were indicted was committed in the county where the venue was laid, and where the trial was had ; and Wharton, in his American Criminal Law, p. 280, says, such proof is sufficient, and reason and practical justice say the same thing everywhere. A violent presumption is certainly raised by the evidence presented to the court in this record. The courts of the State would be recreant in duty, if they neglect to observe, continually, that the Criminal Code, adopted for the prevention, suppression and punishment of crimes, is to be construed as directed by Article 1611, Paschal's Digest, "according to the plain import of the language in which it is written, without regard to the distinction usually made between the construction of penal laws and laws upon other subjects." This is the law for the guidance of this court; yet it is often asserted in argument by counsel, and interpolated in judicial opinion, that penal statutes are to be construed strictly, even under the present system of criminal law in the State. Certainly, in all doubtful cases, precedent and former adjudication of what the law may be should have great weight with all courts. But all courts would

but subserve the interest of society and fulfill the obligations of conscience, by the observance of that remarkable institute of Justinian, so replete with wisdom and so pre-eminently just, in which it is ordered: "Let no judge or arbiter believe himself bound to follow official opinions which he holds not to be correct; nor even the judgment of the prefect or other magnates; nor those of the Supreme Court of Prefecture and of other Supreme Courts; but we commend all our judges to follow truth, justice and law. It does not seem good to us, that if one judge decide wrong, his error should be extended to others. The decision of the judge should be founded on law, and not on precedents."

The language of the Criminal Code is very explicit, that when a party is accused of murder, he may justify the homicide by proof of threats made against his own life by the slain party. The rule which controls the mode of its introduction, however, is still left by the code to be settled by the principles of the common law. They must be actual threats to take the life of the accused, and those threats must be brought directly to his knowledge.

If the justification is attempted upon the ground of such threats having been previously communicated to the slayer, it must be unequivocally shown that the party slain was doing some act at the time of the killing, which manifested an intention to carry the threat into execution. It is necessary at that moment there should be some positive demonstration of the fell purpose, to warrant the exercise of this extreme right of sacrificing the life of a human being. If such positive demonstration is made by the party slain, at the time of the homicide, the accused is entitled always to the benefit of such testimony as will show all such threats of his victim, which were communicated to him before the killing.

The communication made by the witness Abbott to the slayer Myers was no threat of the deceased Millican to do personal

violence to the accused by himself. It was nothing but an opinion expressed by him of the probable consequences which might result from the line of conduct he was pursuing; and, instead of indicating a purpose to assassinate him, was expressive of some solicitude about the peril in which he was placing himself in that community. The language of the communication of this witness cannot be tortured into a threat of personal violence intended by the decedent.

All the false hue and false coloring of a threat of personal violence by the deceased, the transaction borrows as the reflected light of the alleged actual threat set forth in the bill of exceptions as the intended statement of Cannon as a witness, but which never was communicated to the slayer. The statement of the witness Edwards to the accused, had no more the complexion of a threat of personal violence of the deceased upon the slayer, than did the testimony of the witness Abbott.

These were the only witnesses who made any communications to the accused; and these communications were not threats but the mere expressions of an opinion of the peril in which the accused, R. C. Myers, was placing himself in an excited community. Without the testimony set forth in the several bills of exceptions, these two witnesses who made the communication did not interpret them as threats of violence by the decedent.

There being, therefore, no threat by the decedent to take the life of the accused, which was communicated to him, his action at the time of the homicide could not have been founded upon any reasonable expectation that deceased was about to carry threats upon his life into execution.

The law therefore implies malice in the killing, and the verdict of the jury, whose province it was to judge, and who seemed to have judged reasonably about the facts, only respond to the just demands of the law. The excluded testimony presented in the bills of exceptions was properly excluded by the court; facts

they might be, but they were inadmissible by the rules of law, and would not have shown any legal justification for the homicide.

The judgment of the district court is affirmed, and the new trial refused.

Affirmed.

DENISON, J.—There is one error in the rulings of the court below disclosed by the record, in the first paragraph of bill of exceptions (B), which I am constrained to believe sufficient to warrant the reversal of the judgment below. This paragraph is as fellows, to-wit:

"State of Texas v. Robt. C. Myers, Geo. W. Hardy, David Myers. In the District Court Brazos county, Spring term, A. D. 1870.—Be it remembered that on the trial of the above entitled cause the following rulings were made by the court: First, the counsel for the State introduced a witness, T. C. Woodlief, who testified that on Sunday evening about four o'clock of the day of the killing of W. H. Millican, one of the defendants, R. C. Myers, went to the house of witness under great agitation and excitement, and entered one of the rooms and commenced loading a gun. That upon cross-examination defendants asked witness what was said by defendant Myers at that time, as explanatory of his excitement and purpose in loading said gun; which was objected to by the counsel for the State, which objection was sustained by the court, and said witness was not permitted to testify as to the declaration of said Myers at the time."

In Monroe v. The State of Georgia, (5 Ga. Rep., 133-4,) the court say: "When the declarations of a party accompany the act and are a part of the transaction, they are admissible." And "that to be a part of the res gestæ, the declarations must have been made at the time of the act done, which they are supposed to characterize, and well calculated to unfold the nature and quality of the facts they intended to explain." (Russell v. Fresbie, 19

Conn. Rep., p. 205, and cases there cited; Greenleaf on Evidence, vol. 1, §§ 108, 109, 110, 111, 113, 114; Roscoe on Crim. Ev., pp. 22, 23.)

The statement of Myers, at the time, explanatory of his excitement, and of his purpose in loading the gun, were of the *res gestæ* of the facts proved by the State to criminate Myers. They were part and parcel of the facts, and it was error not to permit the defense to prove them upon cross examination.

With the conclusions drawn from the particular premises assumed in the opinion of the majority of the court I fully concur; but as that opinion wholly ignores this (as I esteem it) fatal error, I respectfully dissent.