[No. 1401.]

ALBERT NEYLAND *v.* THE STATE.

1. PRACTICE—COMPULSORY PROCESS—SERVICE.—It is a constitutional provision (Article 1, section 10) that in all criminal proceedings the accused shall have compulsory process for obtaining witnesses in his favor. A subpœna is such process, and the mode and manner of its issuance, service and return, and penalties for disobedience, are provided for in the Code of Criminal Procedure, Articles 477 to 486.

2. SAME.—Article 479 of the Code of Criminal Procedure declares the legal requisites of the service and return of a subpœna, and requires that the officer's return shall show the time and manner of service, if served, and, if not served, the cause of the failure to serve; and, where the witness could not be found, the return is required to show the diligence used by the officer in his search for the witness, and what information, if any, he has obtained of the whereabouts of the witness.

3. SAME.—As a general rule, return on process of every kind should show that the officer has performed what the mandatory part of the process required. And where the law prescribes any particular form of proceeding in the service, the return should show a strict compliance therewith.

4. SAME—CONTINUANCE—OFFICER'S RETURN.—The return of an officer on a subpœna of "not executed," "not found," "not served," is insufficient in any criminal case, and authorizes a continuance, when the evidence of the witness is shown to be material, to the same extent as though the process had not been returned. See the opinion *in extenso* on the question.

5. SAME.—See the opinion for suggestions to trial courts and officers with respect to the question involved.

6. MURDER IN THE SECOND DEGREE—MANSLAUGHTER—CHARGE OF THE COURT.—The law of manslaughter is no part nor parcel, nor is it essential to a correct understanding of the law of murder in the second degree; and the position that no charge upon murder in the second degree is sufficient under the statutory definition of murder unless it explains the law of manslaughter is not tenable.

7. SAME.—The first sentence of Article 605 of the Penal Code contains a complete, general definition of murder as a distinct, substantive offense; and the language used in the concluding sentence of that article amounts to no more than a general rule, stating an abstract proposition, designed to aid the court in framing the charge, and not to assist the jury in the discharge of their functions.

8. SAME.—In the absence of facts and circumstances tending to establish or create doubt as to whether the crime be murder or one of the less degrees of culpable homicide, there is no necessity for the charge of the court to distinguish murder from those degrees.

9. SAME.—Notwithstanding the customary practice of trial courts of prefacing charges on murder in the second degree with definitions of murder in the first degree, in order to distinguish the difference between express and implied malice, such preliminary definition of murder in the first degree is not indispensable to a clear understanding of the law of murder in the second degree, and where the evidence demonstrates that the homicide was not less than murder in the first degree, there is no occasion to instruct the jury upon other degrees or grades of homicide. See the opinion *in extenso* on the principles involved.

10. SAME.—MANSLAUGHTER is predicated alone upon the supposition of the existence of an adequate cause, and, without some evidence of an adequate cause, it is not only unnecessary but would be improper to charge upon manslaughter.

11. PRACTICE—CHARGE OF THE COURT.—When the court has charged the law correctly in reference to the facts of the case as proved, it is not error to refuse to modify the charge and adapt it to a lower grade of offense when there are no facts in evidence applicable to such charge in the modified form.

12. SAME—CASES CITED AND EXPLAINED.—In *Whitaker* v. *The State*, 12 Texas Ct. App., 436, and *Brunet* v. *The State*, 12 Texas Ct. App., 521, the charges given, in effect, made implied malice or murder in the second degree depend actually upon the absence of facts and circumstances sufficient to reduce the offense to manslaughter or negligent homicide, or which would excuse or justify the killing—an improper charge where a lower grade is not· involved. But, if given when not demanded, the lower grades mentioned should be explained, with the law governing them.

13. SAME—MURDER IN THE SECOND DEGREE—IMPLIED MALICE.—Since the earliest adjudications in this State upon felonious homicide, it has been held that where it is shown that a homicide was intentionally committed, and the facts show that it was done neither with express malice nor under circumstances excusing, justifying or mitigating the act, that the law in that event implies malice and the offense is murder in the second degree. See the opinion *in extenso* for a charge held to be in substantial compliance with this rule, except that, in the definition of "implied malice," it omits circumstances "*mitigating*" the act.

14. SAME.—"Circumstances" may fail to excuse or justify a homicide, and yet they may mitigate it so as to bring it below murder in the second degree, in which event that degree should not be found.

15. SAME—PRACTICE.—In connection with the definition of implied malice, if there be facts proved to excuse, justify or mitigate the act, it would be necessary, perhaps, for the court to further explain the law with reference to such facts. In the absence of such facts, such necessity would not arise.

16. SAME—MANSLAUGHTER.—If in a murder case there be evidence, which, however inconclusively, tends to prove facts from which the jury may deduce a finding of manslaughter, it is incumbent on the trial court to give the law of manslaughter in charge to the jury; and it should be given affirmatively, directly, and pertinently to the theory of the case indicated by such evidence. See a state of facts demanding a charge upon the law of manslaughter.

17. Declarations as Res Gestæ.—A State's witness having testified to the declarations as to the circumstances of the homicide, made to him by the defendant within thirty seconds thereafter, the defendant offered a witness on his own behalf to testify to the same declarations, so made to the State's witness at the same time. *Held*, admissible, notwithstanding the State's witness had testified to the same facts; and the court erred in the exclusion of the testimony.

Appeal from the District Court of Orange. Tried below before the Hon. W. H. Ford.

The indictment charged the appellant with the murder of Jasper Gibson, in Orange county, Texas, on the twenty-first day of May, 1882. His trial resulted in his conviction of murder in the second degree, and his punishment was assessed at a term of eighteen years in the penitentiary.

Webb C. Gibson, the brother of the deceased, was the first witness introduced by the State. The substance of his testimony was that on the Sunday of the killing he, the deceased and the defendant attended church in the country, about three miles northwest from the town of Orange. After church, they started in company on their return, the deceased and the defendant riding side by side, the deceased to the right of the defendant, and the witness to the left of the defendant, and a little in his rear. The deceased wanted to go by Cole's place, and the defendant wanted to go another route. The discussion of this difference resulted in the defendant taking hold of the bridle reins of the horse of the deceased and leading him a short distance, when the deceased agreed to go the route insisted upon by the defendant. When they reached a point in the prairie about four hundred yards distant fron John Lyons's place, riding in the order described, the defendant shot the deceased through the head with what the witness took to be a Smith & Wesson thirty-eight calibre pistol. The witness did not see the defendant draw the pistol, but saw him fire it. After shooting the deceased, the defendant drew his pistol on the witness, and told him that if he, the witness, said a word about the shooting he, the defendant, would kill the witness. Thereupon the defendant rode off.

When the pistol fired, the deceased's horse sprang forward, and the deceased fell backwards. He did not speak or move after he was shot. He was killed dead. The pistol was fired about a foot distant from the deceased's head, while the deceased was riding along looking straight ahead. The deceased was not

saying anything or doing anything when he was shot, nor were either of the parties saying or doing anything to indicate that they were angry at the time of the shooting. The parties were not talking at the time, or the witness would have heard them. The witness had been with the defendant and the deceased all day, and they had not had an angry word with each other during the day, but, on the contrary, appeared to be good friends. The witness did not see the deceased draw or attempt to draw his pistol at the time he was killed, nor did he see anything in his hands when he fell.

Cross-examined, the witness stated that if the deceased and defendant were talking at all at the time of the shooting, he did not know what they were talking about. The shooting took place between two roads, and the deceased's horse, when the deceased fell, ran off towards Mr. Cochran's. The witness saw the deceased and the defendant have hold of a pistol between them, near the church, but he did not know to which of them it belonged, nor which of them took it from the other. The deceased and the witness both had pistols when they left home that day. They also had whisky, and had been drinking some—took several drinks after leaving town, and the witness drank some at the church.

The witness and the deceased went to Orange on the morning of the killing, and finding the defendant in front of the Casino saloon, invited him to go to church in the country. He declined at first, but after he and the deceased went into the saloon he agreed to go, got his horse, and did go with the deceased and the witness. No one else went with the party. The witness did not see the defendant take hold of the deceased at the church and tell him to put up his pistol. The deceased fell off his horse about the time of leaving church. As soon as the defendant rode off after the shooting, the witness spoke to the deceased, and, finding him dead, rode rapidly home to tell the news, passing Hudson's *en route*, where he told what had happened. The witness did not dismount from his horse after the shooting and before riding home. The defendant and the deceased had been talking before the pistol fired, but if they were talking at the time the witness did not hear them. On their way from the church, the party passed Neal Barton, his brother and Silas Depuy. The Bartons and Depuy did not repass them. The witness did not remember seeing the deceased have his pistol out after leaving the church, or hearing the defendant ask him to put it

up. He did not remember having stopped on the road after church until the shooting occurred. The witness told his brother Lem how the shooting occurred, before the inquest, which was held late in the afternoon. He remembered asking Silas Depuy, after Depuy had testified before the examining court, when it was that he, the witness, fell from his horse. He asked this question to see what Depuy would say.

G. A. Hudson, justice of the peace, testified that he held the inquest on the body of the deceased, at about four o'clock on the evening of his death. He described the wound in the head, and stated that the face was somewhat powder-burned.

Cross-examined, he stated that Webb Gibson stopped at his house, on his way home, and told him that the defendant had killed the deceased. Webb left immediately after notifying the witness, and rode towards home very rapidly, and apparently much excited. Mr. Cole reached the body before the witness did, and had covered it with a quilt. The witness found a large Colt's cartridge six-shooter under the feet of the deceased. Two chambers were empty and did not contain even a cartridge shell. The hammer was down on one of the empty barrels. The face of the deceased was not much powder-burned. The witness knew of a person to be powder-burned from a distance of over seven feet, but that was from the discharge of an old British musket.

John Cole was the next witness for the State. He testified that he was at the house of John Lyons on the day of the killing. The deceased was killed about three hundred and seventy-five yards from Lyons's house. He saw the defendant, deceased and Webb Gibson ride by Lyons's house. The deceased rode on the right of the defendant, Webb Gibson on his left and a little to the rear. They stopped a few moments in front of Lyons's house, and again at a point about two hundred yards distant. The witness saw the defendant take hold of the reins of the deceased's horse, and turn him around and lead him a short distance. All the parties seemed to be somewhat under the influence of liquor. The witness next saw the defendant riding towards Lyons's house. He first saw the body about one hour after death. A leather belt about an inch wide was around the body. There was no pistol scabbard on it. An uncocked pistol lay under the deceased's left foot.

Cross-examined, the witness stated that at the gait the defendant was riding when he returned to Lyons's house, he could

have ridden from where the body lay in thirty seconds. The witness met the defendant at the gate, and asked him what was the matter, and he replied that he had shot the deceased, but had to do it in self-defense, in order to save his own life. He had his pistol in his hands when he reached Lyons's house. He asked the witness to go and see the deceased, and said that he was afraid he had got into trouble, but that he had been between two parties long enough, and intended to fight out. The witness then went to Mark Cole's and found Lem Gibson, and he and Lem went to the body and covered it with a quilt. The witness was at church on that morning, and saw the deceased and the defendant come into church. After a while the deceased went out of church, and within five minutes the defendant passed out, whispering to the witness that he "would go and see about that boy, that he was liable to get into trouble."

Mrs. Mary Gibson, the mother of the deceased and of the witness Webb Gibson, testified, for the State, that when Webb reached her house with the news of the killing, he appeared to have been drinking, but was sober enough to tell all that had happened. The State closed.

T. B. Woods, the brother-in-law of the defendant, testified that he was at Lyons's house when the homicide occurred. He saw the parties pass Lyons's house, and saw them stop a time or two afterwards and turn their horses about after the manner of drunk men. Within five minutes after they passed Lyons's house, the defendant returned alone. The witness heard him talking to John Cole, and heard him tell Cole that he had shot Jasper Gibson. The State objected, and the court refused to permit the witness to detail the conversation which he heard between the defendant and John Cole.

Silas Depuy, for the defense, testified that he was at church on the day of the killing, in company with Nealy and Owen Barton, and saw the two Gibsons and the defendant there. The witness and the Bartons were about the last to leave the church after services. They had gone about one hundred yards, when the defendant and the Gibsons came loping up behind, and the witness and his party gave the road. Defendant and the Gibsons stopped shortly after passing the witness and his party, and Webb Gibson fell from his horse. The deceased immediately drew his pistol, and the defendant caught it, saying: "That will never do, Bud; put up your pistol." The witness and the Bartons rode past them and struck a lope, leaving them. The

witness could not say that the deceased was angry, and was trying to shoot the defendant, when he pulled his pistol. Nealy Barton asked Webb Gibson, at the church, what was the matter with the deceased, and Webb said that he did not know. The witness saw the defendant at the church assisting the deceased to walk straight. The defendant appeared to be acting the part of a friend to the deceased. The witness saw no disturbance at the church. The deceased was considered a dangerous man when drunk.

Cross-examined, the witness stated that he did not see the deceased make an effort to hurt the defendant when he drew his pistol, nor did he hear him make any threats against the defendant. The two appeared friendly at the time.

John Noguess testified, for the defense, that he was at church on the day in question, and was outside of the church for a time. He saw both of the Gibsons have their pistols out, near the church, during services. While the deceased had his pistol out, the defendant came out of church and tried to get him to put it up. They both had hold of the pistol, and the defendant was trying to make the deceased behave. He saw nothing indicating that the defendant and the deceased were angry. There was no row or difficulty between them.

Hugh Smith testified that he was in the Casino saloon on the Sunday morning of the homicide when the deceased and the defendant went into it. The deceased was pursuading the defendant to go to church in the country. They bought two bottles of whisky to take with them.

Joseph Broussard testified that he waited upon the jury of inquest in the capacity of deputy sheriff. He went to Mrs. Gibson's about half-past three o'clock to procure the attendance of Webb Gibson as a witness, and found him asleep on the gallery, and saw where some one had vomited on the steps. Webb was not drunk after he was awakened. They met Lem Gibson within about one hundred yards of the inquest. Lem and Webb walked to the inquest together, talking. Billie Foreman was with the witness.

Foreman testified, for the defense, that he and Broussard found the witness Webb Gibbson at home, asleep, when they went to take him before the inquest. The deceased was regarded by those who knew him a dangerous and reckless man when in liquor.

Jack Gilbert testified, for the defense, that he saw the Gib-

sons in town on the day before the killing, and heard them in-
vite the defendant to go with them to a country church next
day.    They appeared anxious that he would agree to go.    The
defendant told them that he did not think he could go.    They
appeared very anxious for him to go.    They seemed to be friendly.
The witness considered the deceased a peaceable man when so-
ber, but violent, quarrelsome and dangerous when in liquor.    He
frequently got drunk.    This reputation for violence was proved
by several witnesses.

Two or three witnesses testified that they saw Webb Gibson
on his ride from the body home, and that he rode rapidly and
like a man very drunk or very much excited.

M. Hanks testified that during the first week in May he heard
James Harris ask the deceased when he last heard from Oliver
Delano.    The deceased replied that "Ol. has not written."    Har-
ris then asked him why he did not write to Delano.    The de-
ceased answered: "It is no use, because Albert Neyland takes
my letters out of the office, and, d—n him, I intend to kill him
if he don't quit, the very first good chance I get."

Isaac Alexander testified, for the defense, that the deceased
was at his house two or three weeks before the killing, and told
him that some of the Harris family had been notified to leave
the country, and that the defendant had best leave too, or he
would "get it in the neck."    He said that he, deceased, was
going to church in the country on next church day, and that the
defendant would cross the bayou bridge some day and be "d—d
lucky to get back;" that he, defendant, would be killed "too
d—d dead."    The witness believed that the third Sunday in the
month was church day.    The bayou bridge was between town
and the church.    The defendant lived in town, and the Gibsons
beyond the bridge.

*S. H. Chenault, G. H. Wells, W. Chambers* and *S. P. West,*
filed able and exhaustive briefs for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, P. J.    Our constitution provides that in all criminal
prosecutions the accused "shall have compulsory process for ob-
taining witnesses in his favor.    (Const., Art. 1, sec. 10.)    A sub-
pœna is a compulsory process; and the mode and manner of its
issuance, service and return, and penalties for disobedience of

its mandate, are fully provided for in the Code of Criminal Procedure, from Article 477 to Article 486, inclusive. Article 479 declares the legal requisites of the service and return of the subpœna. It says:

"A subpœna is served by reading the same in the hearing of the witness. The officer having the subpœna shall make due return thereof, showing the time and manner of service thereof, if served, and if not served he shall show in his return the cause of his failure to serve it, and if the witness could not be found he shall state the diligence he has used to find him, and what information he has, if any, as to the whereabouts of the witness."

As a general rule an officer's return on process of every kind should state that he has performed what the mandatory part of the process required of him. And when the law requires and prescribes any particular forms of proceedings in the service, the return should show that they were specifically complied with, and should set them forth as fully and circumstantially as if they had been specially required in the mandatory part of the process.

In defendant's application for continuance for absent witnesses, it is shown that the subpœnas issued had in several instances been returned by the sheriff indorsed simply, "not executed," "not found." This is not a compliance with the statute, and such negligence and failure of duty cannot be tolerated in any criminal case, much less where a defendant's life is at issue. No doubt can be entertained as to the evident object and intention of the requirements of the statute. If the facts are stated in the return, the court will be the better enabled to act advisedly in the premises in determining whether the witness is accessible at all, and can probably be obtained if the continuance be granted; and, on the other hand, a proper legal return will also in many instances afford ample ground to the defendant for suing out the additional and more compulsory writ of attachment, to enforce the attendance. An officer receiving the subpœna must endeavor to execute it; he must state the diligence he has used to find the witness; and, if not found, he must furnish all the information, if any, which he has acquired as to the whereabouts of the witness. None of these things are shown by a return "not found," "not served," "not executed." For aught that appears from such a return, the witness may have been in the county, within easy reach, and could have been

readily found if an effort had been made; and it may be a fact that, without trying to find him, the officer coolly pockets the process, and, the witness having failed to come upon him at the last moment, he eases his conscience and thinks to satisfy his official duty by a return of "not served," "not found," "not executed." Such return is not legal, and it may in fact be as untrue as it is illegal. It may be more—it may deprive a defendant of his right to other more compulsory process. We are of opinion that such a return, where the evidence is shown to be material, authorizes a continuance to the same extent as though the process had not been returned. It certainly should not be held to affect the diligence required of a defendant with reference to his further process; he should not be held responsible nor made to suffer for such gross dereliction of duty on the part of the officer.

In this particular case we do not say it was reversible error for the court, in consideration of the defective returns, to overrule the application for continuance, nor in the particular instances wherein the returns were defective can we say the court erred in overruling the motion for a new trial on account of the admissibility and materiality of the proposed testimony, considered in connection with the evidence adduced on the trial. Our observations upon this matter are induced rather by the fact that this is the first case in which this important subject has been called directly to our attention since the statute quoted was adopted as part of our Revised Code; and with a further purpose of calling the special attention of district judges and sheriffs to the importance of a strict observance of its provisions, and the consequent injuries likely to ensue from their non-observance.

Appellant was convicted of murder in the second degree. His counsel urgently insist that the charge of the court upon murder in the second degree is radically defective; that the court should have charged upon the law of manslaughter, for two reasons; first, because the law upon that subject is a part of and essential to a correct understanding of murder in the second degree; and second, because manslaughter was part of the law applicable to the facts proven. In effect, the first position assumed is that no charge upon murder in the second degree is sufficient under the statutory definition of murder unless it explains the law of manslaughter. Part of the definition of murder, and an essential part, it is contended, is that portion of the statute which declares that " murder is distinguishable from every other

species of homicide by the absence of the circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide" (Penal Code, Art. 605); and that, if this distinction is necessary to be drawn, then in every such case the law must be fully explained, and the jury be instructed upon negligent homicide, manslaughter, excusable and justifiable homicide, in order that they may readily recognize and intelligently discriminate the characteristic qualities which distinguish murder of the second degree from the lower grades of culpable homicide.

We do not concur in this view of the matter. A complete general definition of murder as a distinct substantive offense is plainly and fully conveyed by the language, "Every person with a sound memory and discretion who shall unlawfully kill any reasonable creature in being, within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder." (Penal Code, Art. 605.) The other expression contained in the second sentence of said article, that "murder is distinguishable from every other species of homicide by the absence of the circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide," is no part of the definition, and amounts to no more than a general rule, or the statement of an abstract proposition, prescribed by law for the purpose doubtless of aiding and guiding the court in determining whether the offense is murder or one of the lesser degrees of homicide, so that the charge to be given may be framed accordingly. It is a suggestion rather to the judge than a help to the jury in the performance of their functions. If there are no facts and circumstances tending to establish or creating a doubt as to whether the crime be murder or one of the lesser degrees, then there is no necessity or occasion for the court's charge to distinguish murder from those degrees, and to attempt to do so would only tend to confuse the real issue to be determined, which is whether the party is guilty or not guilty of murder. It is by no means impossible to charge understandingly all the law of murder of the second degree, without explaining beforehand murder in the first degree, though this is ordinarily done for the purpose of distinguishing the difference between express and implied malice, the distinctive ingredients of the respective degrees. But on the other hand, if under the evidence the homicide could not be less than murder in the first degree, then there is no occasion to instruct the jury

upon any of the other degrees or grades less than murder in the first degree. (*O'Connell* v. *The State,* 18 Texas, 244; *Washington* v. *The State,* 1 Texas Ct. App., 647; *Hubby* v. *The State,* 8 Texas Ct. App., 597.)

Neither is the court required, nor is it at all necessary, to charge upon manslaughter if the proof shows only murder in the first or second degree. Manslaughter is predicable alone upon the supposition of the existence of *an adequate cause.* (*McKinney* v. *The State,* 8 Texas Ct. App., 626.) Without some evidence of an adequate cause, it is not only unnecessary, but would be improper to charge upon manslaughter. (*Daniels* v. *The State,* 24 Texas, 389; *Meyers* v. *The State,* 33 Texas, 525; *Hudson* v. *The State,* 40 Texas, 12; *Jones* v. *The State,* 40 Texas, 188; *Boyett* v. *The State,* 2 Texas Ct. App., 93; *Halbert* v. *The State,* 3 Texas Ct. App., 656; *Grissom* v. *The State,* 4 Texas Ct. App., 374; *Roberts* v. *The State,* 5 Texas Ct. App., 141; *Berry* v. *The State,* 8 Texas Ct. App., 515; *Eanes* v. *The State,* 10 Texas Ct. App., 421; *Williams* v. *The State,* 10 Texas Ct. App., 529; *Hill* v. *The State,* 11 Texas Ct. App., 456.) When the court has charged the law correctly in reference to the facts of the case as proved, it is not error to refuse to modify the charge and adapt it to a lower grade of offense, when there are no facts in evidence applicable to such charge in the modified form. (*Mayfield* v. *The State,* 44 Texas, 59.)

Counsel for appellant refer very confidently for the latest expression of this court to the cases of *Whitaker* v. *The State,* 12 Texas Ct. App., 436, and *Brunet* v. *The State,* 12 Texas Ct. App., 521. In both those cases the charge given, in effect, made implied malice, or murder of the second degree, actually depend upon the absence of facts and circumstances sufficient to reduce the offense to manslaughter or negligent homicide, or which would excuse or justify the killing. This, as we have seen, is not a proper charge to be given where a lower grade is not involved. If it is given, however, when not demanded, we do not see how the jury is to understand and comprehend it unless the lower grades mentioned are explained, with the law governing them.

But it is said a charge upon implied malice or murder of the second degree cannot be given without explaining the lower degrees. We see no reason why, and in this very case before us, we think, with perhaps the omission of a single expression, the

charge of the learned judge does present the law of murder in the second degree. His charge is as follows:

"Every person with a sound memory and discretion who shall unlawfully kill any reasonable creature in being, within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder.

"Murder is of two degrees, to-wit, murder of the first degree and murder of the second degree. All murder committed with * * * * * * express malice is murder in the first degree, and all murder not of the first degree is murder of the second degree.

"Express malice is where one with a sedate, deliberate mind and formed design doth kill another, which formed design is evidenced by external circumstances discovering that inward intention, such as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him bodily harm, and the like.

"Implied malice is that malice which the law presumes to exist in him who commits any deliberate and cruel act, however sudden done or committed, without just cause or excuse, in such a manner as to indicate a wicked and depraved spirit, or a heart regardless of social duty and fatally bent on mischief."

Whilst the charge thus far might have been fuller and more explicit perhaps, still we think, with the exception or omission to be hereafter noted, it substantially presents the general rules of law upon murder in the first and murder in the second degree. After applying the law of the first degree to the case, the application with regard to murder in the second degree is thus submitted, viz: "If the jury do not believe from the evidence, beyond a reasonable doubt, that the defendant, Albert Neyland, did, in Orange county and State of Texas, with a sedate and deliberate mind and formed design to take the life of Jasper Gibson, fire upon, shoot and kill Jasper Gibson, but do believe from the evidence, beyond a reasonable doubt, that the defendant, Albert Neyland, did, in Orange county and State of Texas, on or about the twenty-first day of May, A. D. 1882, while acting under the immediate influence of sudden passion, such as anger, rage or resentment, or while under the influence of some sudden emotion of the mind unexplained by the evidence, and unaccompanied by the facts and circumstances constituting express malice, fire upon and kill Jasper Gibson, with a pistol, in a deliberate and cruel manner, such as to indicate a wicked, depraved and

reckless disposition, then, and in that case, you will find the defendant, Albert Neyland, guilty of murder in the second degree, and assess his punishment," etc.

After a most careful and critical examination of all the authorities and definitions of the term "implied malice," a correct rule was laid down by Judge Clark, supported, as he says, by the established doctrine with us from the foundation of our first court. That rule is that, "where it is shown that a homicide was intentionally committed, and the facts show that it was done neither with express malice nor under circumstances excusing, justifying or mitigating the act, that the law in that event implies malice, and the offense is murder in the second degree." (*Douglass* v. *The State*, 8 Texas Ct. App., 520; *Harris* v. *The State*, 8 Texas Ct. App., 90; *Hubby* v. *The State*, 8 Texas Ct. App., 598.)

If the charge, as quoted, is considered with reference to this definition of implied malice and murder in the second degree, it will be found substantially correct, except that it omits, in the definition of "implied malice," circumstances "*mitigating*" the act. Circumstances may fail to excuse or justify the act, and yet they may mitigate it so as to bring it below murder in the second degree, in which event that degree should not be found. In connection with the definition of implied malice, if there be any facts proven tending to excuse or justify or mitigate the act, then it would be necessary, perhaps, for the court to further explain the law with reference to such facts; but if there are no such facts, then it is not necessary to do so.

The second proposition with regard to the charge is that manslaughter was part of the law applicable to the facts proven, and therefore should have been given. In one aspect of the case we are of opinion this position is correct, and with respect to that phase of the case the court should have given it. It appears that many threats had been made by the deceased against the life of defendant, and that they had been communicated to him. Shortly after leaving the church and but a short time before the killing, some parties pass the deceased, his brother, and defendant. Deceased has his pistol out, and defendant is remonstrating with and trying to get him to put up the pistol. After he was shot, his pistol was found lying on the ground by him, showing that it must have dropped from his hand as he fell from his horse. Now if, on account of these actions of deceased taken in connection with his previous threats, defendant was put in such

a state of anger, rage, resentment or terror as in a person of ordinary temper was sufficient to render the mind incapable of cool reflection, then there was "adequate cause" for the killing, and it would be of no higher degree than manslaughter. (Penal Code, Art. 595.) Such facts might have been insufficient to satisfy the jury that defendant acted in self-defense, and yet amply sufficient to warrant them in finding manslaughter.

"If in a murder case there be evidence which, however inconclusively, tends to prove facts from which the jury may deduce a finding of manslaughter, it is incumbent on the trial court to give the law of manslaughter in charge to the jury; and it should be given affirmatively, directly, and pertinently to the theory of the case indicated by such evidence." (*McLaughlin* v. *The State*, 10 Texas Ct. App., 340.)

We are of opinion that the court also erred, as shown by the second bill of exceptions, in refusing to permit the witness Theo. Wood to give in evidence the declarations of defendant as to the circumstances of the homicide made to the witness John Cole within a half minute after the killing. It was true Cole had testified as to these declarations, but this was no reason why defendant should be deprived of his right to have his own witness testify to the same facts. These declarations, in spontaneity and in point of time, came most clearly within the rule of *res gestæ* (see *Foster* v. *The State*, 8 Texas Ct. App., 248, and authorities), and should not be treated as self-serving declarations.

Other errors are assigned, but they are not considered well taken or likely to arise on another trial.

For the errors above discussed, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Opinion delivered March 3, 1883.