Hughey v. The State.

| 47 | 97 |
|----|----|
| 96 | 88 |
| 47 | 97 |
| 116 | 470 |

## HUGHEY *vs.* THE STATE.

[INDICTMENT FOR MURDER.]

1. *Threats, evidence of; for what purpose inadmissible.*—The proof showing the commission of a felonious homicide, perpetrated by the accused by lying in wait, he offered evidence that deceased had often threatened his life, and the day before the killing had lain in wait in the road to shoot him, and that this was known to accused before the killing; but also stated, in reply to a question by the court, that he did not expect to show any act done by deceased at the time of the killing indicating an intention to kill accused or do him great bodily harm, but that he did expect to show such act on the part of deceased as late as the evening before, and thereupon the court rejected the evidence,—*Held,* that the evidence was incompetent either to justify or excuse the homicide, and as that was the only purpose for which it was offered, the evidence was rightfully excluded.
2. *Same; what necessary to excuse or justify homicide.*—No mere threats to take life, or even past attempts to execute such threats, will justify or excuse a felonious homicide. There must be actual impending danger to the slayer at the time of the fatal blow, or such a state of facts as are justly calculated to impress upon his mind a reasonable belief of the necessity to take life.

APPEAL from the Circuit Court of Marion.
Tried before Hon. W. S. MUDD.

THE appellant, George Hughey, was indicted for the murder of James W. Crumbia, tried, found guilty of murder in the first degree, and sentenced to the penitentiary for life.

The evidence shows that Hughey and Crumbia were brothers-in-law, living about half a mile apart, and between whom bad and unfriendly feelings had existed for some months previous to, and up to the time of the killing. In reply to a message sent by deceased the day before the killing, informing Hughey that if he would admit that deceased had not stolen some hogs, &c., deceased would be at peace with him, Hughey replied: "What I would say once I would say twice, and what I would say twice I would die by; and if Crumbia believes there is no hell in Georgia, let him go on." Hughey, on the same day, remarked to another witness, who had expressed a desire to see Crumbia and settle matters, that if witness did not go soon, he would not get to see Crumbia.

Two witnesses testified that a few days after the killing the defendant gave them the following account of the killing: On the morning of the killing he took his gun and went through the fields to Crumbia's house, and on getting within a hundred or so yards of the house, sat some time on the fence. He then started in the direction of the house, and after going a short distance he saw deceased in the field, and immediately presented his gun and popped a cap at deceased, who threw up his hands, asked "what do you mean," and then ran into the house. Defendant went a little closer to the house, stopping at the root of a tree, and while there took out a memorandum book and wrote something in it, "as he did not know who might be killed, what he wrote would show something." At this tree Hughey remained for two hours, and then went up near the house and stopped. Defendant intended to get in front of the house, but before he got in front of the door deceased opened it, stepped in, looked around, and immediately went in and shut the door. Defendant thought deceased saw him, and he (defendant) immediately cocked his gun, presented it towards the door, held his thumb on the hammer of the lock so that he might not shoot his sister by mistake,

as he wanted to be sure that it was deceased before he
shot. "As soon as deceased appeared at the door, and
Hughey was certain that it was Crumbia, he pulled down
on him."

Another witness testified that Hughey told him that
while sitting at the root of the tree, he deliberated what
he should do. Other witnesses testified that shortly after
the shooting defendant told them that "he had killed Crum-
bia, and wanted them to see him decently buried at defend-
ant's expense; that he regretted that he had killed Crum-
bia, but Crumbia had repeatedly threatened his life, and
waylaid the road the day before to kill him."

Defendant then offered to prove by several witnesses
that " on various occasions and for some time before the
killing, deceased had been threatening defendant's life; that
on Saturday before the killing deceased presented a gun
at defendant, and would have shot him had he not been
prevented by the by-standers; that on the day before the
killing deceased waylaid the road, with his gun, for the
purpose of shooting defendant, who, being warned of it,
went another road, and deceased, after waiting some time on
the road, went to defendant's home and tracked him a mile
or two. The State objected to the admission of the evi-
dence. The court asked if defendant expected to show
any act done by deceased at the time of the killing indi-
cating an intention on the part of deceased to kill defend-
ant or do him great bodily harm: and upon the reply of
his counsel, that they did not expect to show any such act
on the part of deceased later than the evening preceding
the killing, the court sustained the objection and excluded
the proposed testimony, and defendant excepted."

The widow of deceased testified that on the morning of
the killing Crumbia requested her to go to her father's to
see if defendant was there; that upon her refusal to go just
then, deceased said he would go, and taking his gun started
off. Soon she heard a cap pop, and saw deceased running
with his gun first on one shoulder and then on the other.
He ran into the house and she shut the door. Deceased
then hunted for a crack to shoot through, and asked her

to go out and look for defendant, which she did, but saw nothing of him. After this, at deceased's request, she went to her father's, which was half a mile distant, to hunt for defendant, but saw nothing of him and returned. Deceased went to the door and turned away, and soon looked out again, when the gun fired and he fell, shot through the body, and expired in a few minutes.

After the testimony of this witness, defendant again offered to prove the threats and attempts of deceased as proposed before; but the court excluded the evidence, and defendant excepted.

The court charged the jury as follows:

1. "If the jury believe from the evidence that there was bad and unfriendly feeling existing between defendant and deceased at the time of the killing, and that deceased had made threats against defendant, and on the day before the killing waylaid the defendant; and should further believe that at the time of the killing no attempt was being made to execute said threats, and nothing done to show an intention to execute said threats by deceased, that then the threats so made would afford no excuse or justification for the killing of the deceased."

2. "That if the jury shall believe from the evidence that bad and unfriendly feeling had grown up between deceased and defendant, and existed at the time of the killing, and that on the morning of the killing the defendant left his home with the intention to take the life of deceased, and that on the way to deceased's house defendant met deceased about 150 yards from his home and popped a cap at deceased, and that deceased ran into his house and his wife closed the door, and that defendant, after deliberating some time, went up to the house of the deceased, and as soon as deceased showed himself the defendant shot and killed the deceased, this would be murder on the part of defendant, notwithstanding deceased may have made previous threats to take the life of defendant, and may have waylaid him for that purpose on the day before."

3d. That if the jury believe from the evidence that defendant may have believed he would have either to take

the life of deceased or lose his own at some future time, this would not justify or excuse the killing of deceased, unless at the time of the killing deceased did some act showing an intention of taking the life of defendant, and which act was not provoked by some act of defendant at the time of the killing, showing an intention on the part of defendant to take the life of deceased.

These charges were written, and the jury, with the consent of the court, took the charges with them when they retired. The defendant excepted to each of the charges, and to the action of the court in allowing the jury to take the charges with them.

The defendant then requested the court to give the following written charges:

1. That if the jury believe from all the evidence that defendant believed it was necessary to take the life of deceased, and defendant acted upon that belief alone, then it would rebut the presumption of malice, and defendant in that case would not be guilty of murder.

2. That the delusion on the part of the defendant, that deceased would take his life, and that it was necessary for him to kill deceased to prevent the loss of his own life, brought about from his threats and lying in wait; if from these circumstances defendant really and honestly believed it was necessary to take the life of deceased to save his own, then defendant is not guilty of any offense. The necessity which will justify the taking of life need not be actual, but the circumstances must be such as to impress the mind of the slayer with a reasonable belief that such necessity is impending, and the jury are to determine that fact from all the circumstances.

3. That if the jury believe from the evidence that there was such a derangement of defendant's mind at the time of the killing, that if he did not kill deceased, the deceased would take his life, [and that] the killing was [done] under such a state of mind, they should find defendant not guilty.

4. If the jury, after weighing all the testimony, have a reasonable doubt whether the defendant killed deceased

with malice, or to protect his own life, then they must acquit.

The court refused to give any of these charges, and defendant duly excepted.

· W. S. EARNEST, for appellant.—The charges given are based upon, and in fact are in the language of the court in the case of *State v. Prichett*, 22 Ala. 39.

While we recognize the doctrine laid down in that case as good law, we hold that it is not applicable to the case before the court. That was based upon threats only ; this, upon acts and attempts,—trying to shoot defendant, waylaying the road for him, tracking him on his mule, the day before the killing, and in the morning by sun-up, with his gun going to hunt the defendant. They met, as the evidence shows, on the road from the house of the slain to that of the defendant, about half way.

In the case above referred to the court says : "But however bad or desperate that character may be, and however many threats such person may have made, he forfeits no right to his life until by an actual attempt to execute his threats." In this part of the sentence, and the concluding part, the court intends to draw a distinction between "threats" and "attempts." · "Where threats are made *only*, there must be some act or demonstration at the time of killing." But where there have been attempts to kill at different times and in different ways, by waylaying, &c., it does not require an attempt at the time.

2. The charge is given upon the assumption of law that malice express, as defined in the law books and in the Code (§ 3653) can not be explained ; that if there is a lying in wait, or deliberation, that fixes conclusively the offense. This is an invasion of the rights of the jury. Malice is the essential ingredient of murder. The jury must look to the facts, to all the facts, to find whether malice entered into and made the act murder, or a less offense. The case of *Oliver v. The State*, 17 Ala. 598, gives to the jury all the facts, and leaves with them to find whether the defendant acted from malice, or was governed by the law of self-

protection; and if deceived by appearances, if he acts on such facts as a reasonable man would act, it rebuts malice, though there was deliberation in the killing.

3. The charges asked only sought to leave all the facts to the jury, and for them, as they had a right to do, to determine the malice or the want of malice.

4. The refusal to let all the acts and attempts to kill, waylaying, and tracking, come in, was error. They are of a higher order of evidence than mere idle threats. They can not be placed upon the same level with threats. But if true, as the defendant proposed to prove, they justified, or at least excused the defendant in doing as he did.

J. W. A. SANFORD, Attorney-General, *contra.*

PETERS, J.—The appellant, Hughey, was convicted of murder in the first degree and sentenced to the penitentiary for life, at the fall term, 1871, of the circuit court of Marion county. And he appeals to this court from this judgment of conviction on the matters set out in his bill of exceptions.

No threats unaccompanied with acts which threaten the life or limb of the slayer, will justify or excuse a felonious homicide. The threats insisted on in this case were not of this character. The court properly excluded them, as they could have been offered for no other purpose.—*United States v. Wiltberger*, 3 Wash. C. C. R. p. 515; 2 Archl. Cr. Pl. p. 223 (marg.) *et seq.* and notes, Waterman's ed. 1853.

The objections to the charges given by the court, and to the refusal of those moved for by the defendant on the trial below, proceed upon the same mistake, that mere antecedent threats are an excuse or justification for a felonious homicide. This is not so. There must be actual danger to the slayer at the time of the fatal blow, or such a state of facts as are justly calculated to impress his mind with the existence of such danger, before he is justified to strike in self-defense. Self-defense is simply the resistance of force, or seriously threatened force actually impending, by force sufficient to repel the danger, and no more. If it goes beyond this, there is guilt which is not excusable or

justifiable. This is the result of the cases and authorities above cited.—2 Bouv. Law Dict. p. 509, *Self-Defense*, and cases there cited. On the trial below there was no proof of actual impending danger, or any seeming danger, which would have justified·the prisoner in his heartless destruction of his victim's life. He sought the occasion to kill, with the purpose to kill, when there was no sufficient necessity for it, and when it might have been avoided, and when it was clearly within his power to have resorted to peaceful means to restrain the deceased, had it been his wish to have assaulted him.—Rev. Code, p. 741, § 3956, *et seq.*. We think the conviction was eminently proper, and regular; and it must stand.

The judgment of the court below is affirmed; and that court will proceed to execute its sentence as required by law.