<hr/>

### THOMASON *v.* TERRITORY.

*(Supreme Court of New Mexico.   January 24, 1887.)*

1. MURDER—THREATS OF DECEASED INADMISSIBLE.
     Where, on a trial for a murder, of which the accused was the only witness, it appears, from his own evidence, that he sought out deceased while engaged at his work chopping wood, armed with a rifle and revolver, and shot him when he was in the act of fleeing, having dropped his axe, there being no evidence that there was any gun which he could get, the court will exclude evidence of threats by deceased, as in such a case they would be no justification.

2. SAME—TRIAL—INSTRUCTIONS ON SELF-DEFENSE EXCLUDED.
     Where, on a trial for murder, there is no evidence tending in the slightest manner to show a killing in self-defense, there is no error in a refusal to instruct the jury on the law of self-defense.

3. SAME—INSTRUCTION ON LESS DEGREES NOT REQUIRED.
     Where, on a trial for murder, there is no evidence to indicate murder in any degree less than the first, there is no error in refusing to instruct the jury on the other degrees of murder.

4. SAME — INTERFERENCE WITH JURY — OFFICIAL INTERPRETER SENT IN BY REQUEST OF JURY.
     Where, in a trial under an indictment for murder before a jury, a portion of which cannot speak English, and a portion of which cannot understand Spanish, the jury, after having retired twice, request the court to send the official interpreter to interpret between them, on the ground that they are unable to communicate with each other, and such interpreter is specially sworn, and sent into the jury-room, over the exception and objection of the defendant, no presumption arises that such interpreter acted improperly, and to the prejudice of the defendant, but it is for the defendant to show prejudice if any arose.

5. SAME—OMISSION OF WITNESSES BY PROSECUTION.
     Where, on an indictment for murder, the prosecuting attorney has fully and fairly developed the facts by witnesses called by him before resting his case, there is no error in the court not requiring him to call all the witnesses to conversations with the defendant who were known and present.

Appeal from district court, Socorro county.

[1] Same case, *ante,* 36.

*Wm. Breeden,* Atty. Gen., for appellee. *Fiske & Warren* and *J. S. Tiffany,* for appellant.

LONG, C. J. The defendant in the court below, who is appellant here, was presented by indictment in the district court of the Second judicial district, sitting in the county of Socorro. The indictment charges the defendant with murder in the first degree. He pleaded not guilty, was placed upon his trial before a jury at the November term, 1885, and a verdict of guilty of murder in the first degree was returned, upon which judgment was regularly entered. From this judgment the defendant appeals. Four alleged errors are presented to this court by assignment and in argument as a reason why the cause should be reversed, and a new trial directed. They are stated in appellant's brief as follows: "*First,* the court erred in excluding evidence of previous threats and assaults by deceased; *second,* the court erred in sending the interpreter into the jury-room where the jury were considering their verdict, against defendant's objection; *third,* the court erred in not requiring the prosecution to call all the witnesses to conversations with defendant who were known and present; *fourth,* in refusing to give the instructions respectively asked by the defendant."

These alleged errors cannot be fairly determined without a consideration of the facts established by the evidence. On the nineteenth day of December, A. D. 1885, the defendant shot and instantly killed the deceased in the county of Socorro. The killing occurred in the woods, when the parties were alone together, with no other witness of the transaction. The deceased being instantly killed, his version of the affair was not before the jury. In the morning the deceased went to the woods to chop poles, and was engaged in that work when, without any previous warning, the defendant appeared before him, while deceased was busy chopping. The defendant in his own evidence, taking up the occurrence at the point of meeting, says: "I went to Mr. Potter, [the deceased,] and asked him—he asked me, in fact—what I had come there for, and I told him I had come to have a talk with him, to see if we could not settle that difficulty without any more trouble or hard feelings; and he remarked, 'I will settle nothing; I expect to do just what I said I would do;' and started for a tree or bunch of trees that was about thirty or forty feet away. I told him when he first started to stop. He made no halt until he got in about eight or ten feet of this tree. I again told him to stop, and he turned, facing me or nearly so, and still leaning in the direction of me, and in the direction of the tree, as though he was still aiming to get to that tree, and get a gun, and I shot him, and he turned around, and made about two steps, and fell. After that I turned, and started back to the field to where I was at work. I was about thirty-five to forty feet from the tree near where he fell, at the time I shot." It also appears from the evidence of J. R. Beavers that he was, on the morning of the killing, working in the field with the defendant, and that he (defendant) left the field, and was gone about one hour, when he again came back within that time to the field. The witness Nabor, on redirect examination, testifies that defendant, after the killing, said to witness that the deceased set his axe down when the defendant came up to the place where deceased was chopping. George Earle testifies that on the 19th he was working in a field for himself and the deceased; that he went to work about 8 o'clock in the morning, and found defendant at work in the field hauling barley; that he saw the defendant leave the wagon with which he was at work, and go away; that he watched him while he went about 50 yards, and witness then resumed work; that this was near a mile from where the deceased was killed. Soon after defendant left this field, and went away, the witness heard a shot fired, and immediately heard some one three times cry out, "Oh! Oh! Oh!" the first one loud, the next not so loud, and the last one faint. In about 25 minutes the defendant came back to the field from

the direction where the shot was fired and the cries heard, and was armed with a rifle and pistol.

There is nothing whatever in the evidence to throw a shade of doubt on the facts thus proven, except as to the position of deceased when he was shot. There is evidence tending very greatly to prove that deceased was killed while chopping, and in the act of striking a blow on the limb of the tree with his axe. Giving the defendant all there is in his own evidence, it places him near the tree at the time of the killing. The facts, beyond doubt, are that defendant knew deceased was in the woods. He doubly armed himself, and went nearly a mile to seek him out. What the thoughts were that possessed his mind, and induced his action, can best be determined by what he did. He came upon the deceased wholly unarmed, who almost instantly started to flee, no doubt seeing the rifle in defendant's hand. As he fled, the defendant commanded him to halt, and upon the first moment, at the very instant the command was obeyed, and his body come to a rest, so that certain and deadly aim could be taken, the defendant fired upon deceased, and killed him in his tracks. Deceased had neither gun nor pistol, but was shot down in cold blood, while on the retreat. No weapons of any kind were behind the tree, or elsewhere within the reach of the deceased. Under such circumstances, evidence of previous threats by deceased would add nothing in favor of defendant, if introduced. He was not being assaulted or advanced upon or threatened or menaced. No weapon of any kind was within sight of the defendant or deceased, or present in fact, except the weapons of the defendant.

Speaking of prior threats, the learned author of Wharton on Homicide, §§ 694, 695, says: "Certainly, if such evidence is offered to prove that defendant had a right to kill the deceased, there being no proof of hostile demonstration by the deceased, then it is irrelevant. No man has a right to take another's life if, by appealing to the law, he can avoid the encounter; for if A. threatens B.'s life, and the threat is known to B., his duty is to have A. arrested by due process of law, not to shoot him. On the other hand, if the question is as to which party is the assailant, then it is admissible to prove by prior declarations of either that the attack was one he intended to make. If defendant knew beforehand that his life was threatened, he should have applied to the law for redress."

This is certainly a salutary principle. It involves no personal humiliation, and is certainly no evidence of cowardice, for one who is threatened by another for his life, to appeal, in the first instance, to the law to interpose its preventive protection. Such a principle, well settled in law and adopted in practice, would tend to the protection of human life and preservation of order. The idea, if permitted to gain ground, that one who is threatened with great bodily harm must take his life in his hand, arm himself, and seek out his adversary, and either kill or be killed, will produce constant personal conflict, violence, and disorder. Such a doctrine is as pernicious in morals as it is destructive of life and productive of evil results. It should, by statute, be made the duty of the prosecuting officers, upon receiving official information of such threats, to file, on their own motion, an information requiring the party making such threats to appear before some court having jurisdiction, and then to make inquiry, and, if the threats alleged are established, to require a substantial bond to maintain the peace. This should be an affirmative proceeding by the territory, on its own behalf, to protect life and preserve order. While these observations may not be necessary to the determination of the point involved, if they shall induce the legislative department to take action, some good may result therefrom.

Returning to the point involved. "For the purpose, therefore, *in cases of doubt*, of showing that deceased made the attack, and, if so, with what motive, his prior declarations are evidence." Whart. Hom. § 695.

*Evans* v. *State*, 44 Miss. 762, also cited in Hor. & T. Cas. 328, is in point.

The facts cited in that case were as follows: "The prisoner and deceased were plantation negroes. They had a difficulty. The deceased made threats of death against the prisoner. The prisoner, being armed with a gun, invited deceased, who was at work in a field, to come to the cabins, and they would have it out. The deceased started for the cabins, and, while approaching, apparently with the intention of getting his gun, the accused shot and killed him." Evidence of the prior threats were offered, but excluded, and it was contended that this ruling was erroneous. The court there say: "If the excluded testimony had remained for the consideration of the jury, it would have had no influence on the verdict, unless there was testimony that the deceased at the time of the killing sought a deadly contest with the accused, or was making some demonstration towards the accomplishment of his threat. There were no developments which would have given this evidence a feather's weight."

The two cases are much alike. In the Mississippi case the deceased was shot as he approached, as it was claimed, seeking a gun with which to kill defendant. Here the deceased was shot as he fled, as it was claimed, without an item of evidence, however, to support the contention, going to get a gun for the same purpose.

In *Myers* v. *State*, 33 Tex. 542, the court discuss a question like the one here. In that state it seems, from the opinion, "when a party is accused of homicide, he may justify the homicide by proof of threats against his own life by the slain party." In applying this statute the court say : "If the justification is attempted upon the grounds of such threats, * * * it must be unequivocably shown that the party slain was doing some act at the time of the killing which manifested an intention to carry the threat into execution. It is necessary that there should be at the moment some positive demonstration of the fell purpose."

In *Harris* v. *State*, 47 Miss. 325, it is held: "No mere threats by the deceased are admissible on a trial for murder in justification or palliation of the homicide, unless, in addition to such threats, there was also at the time of the killing some attempt or demonstration by the deceased showing a present purpose and imminent danger of carrying such threats into execution, or doing the defendant great bodily harm." To the same effect are *Hughey* v. *State*, 47 Ala. 97; *State* v. *Hall*, 9 Nev. 58.

It is not doubted, where there is any evidence which tends to show, even in the slightest degree, that the deceased at the time of the killing was advancing in a threatening manner on the defendant, or occupied a menacing attitude towards him, or made the slightest move towards attack, or did any act indicating a present intent to do defendant great bodily harm, that in such cases evidence of prior threats by deceased against the prisoner, and communicated to him, would be competent evidence to be weighed by the jury. The courts should be careful about excluding evidence of this character, and may do so only when there is an entire absence of such circumstances. If there is even slight evidence to indicate that the act of killing was done under a present, reasonable apprehension to himself of great bodily harm, prior threats should not be excluded. In this case, the defendant did offer to prove prior threats, but did not offer to further prove that deceased made hostile demonstrations even of the slightest kind towards defendant, at the time of the killing, nor did he show a gun was behind the tree, or a weapon of any kind, or that the defendant so believed. Under these circumstances, the defendant having sought out the deceased, the court below was right in excluding the evidence. If it were true that deceased had made threats against the defendant, the latter should not have doubly armed himself, and followed up the deceased in a manner likely to cause conflict.

The observations of the learned court in *Harris* v. *State*, *supra*, are very pertinent to the present: "While courts must adhere to reason and justice, as developed by time, experience, and enlightened adjudication, they must,

nevertheless, enforce the laws with all the rigor of which they are capable, as a duty alike to the law-abiding and criminal; for should it become the recognized right of a man to pursue and shoot down another for a threat to take life simply, without any overt act indicating an intention to carry the threat into execution, crime and violence would run riot. * * * To allow prior threats to be given in evidence, under such circumstances, upon the mere proof of a naked and wanton killing, as in the case at bar, would be to invite a multiplication of tragedies."

We find no error in the ruling below excluding this evidence.

There was no evidence whatever before the jury tending, in the slightest, manner, to show a killing in self-defense; so there was no error in the refusal to instruct respecting the law of self-defense.

There was no evidence to indicate murder in any degree less than the first. It was a clear, undoubted case, on the evidence really before the jury, and including that offered and excluded, of murder in the first degree, and nothing whatever to indicate anything less; so there was no error in refusing to instruct as to the other degrees.

The next contention made by defendant presents a question of greater difficulty. It is one, so far as can be found in our research, never decided. Questions somewhat analogous have, however, been determined, and the ruling here must be settled by the presumption which is to prevail respecting the action of the interpreter.

Did the court err in sending an interpreter to the jury?

The principle contended for by defendant is discussed in the cases cited below. It is there, in effect, held that, when the defendant relies upon an alleged irregularity of the court or jury, the burden is upon him, not only to show it, but also to show he was prejudiced thereby. *Reins* v. *People*, 30 Ill. 273; *Adams* v. *People*, 47 Ill. 376; *State* v. *Wart*, 51 Iowa, 587, 2 N. W. Rep. 405; *People* v. *Douglass*, 4 Cow. 26; *Stephens* v. *People*, 19 N. Y. 549. Authority, however, may be found to the contrary.

The general rule is stated in Thompson and Merriam on Juries, § 349, in this manner: "The courts generally agree that, where the interference of strangers with the jury has not been promoted by the prevailing party, has not been attended with corruption, and it does not reasonably appear that substantial prejudice has resulted to the party complaining, the verdict will not be disturbed for this reason, whether the cause be civil or criminal, capital or otherwise. * * * The fact of communication, without more, creates, in the view of some courts, an unfavorable presumption, which, unexplained, will overturn the verdict; whereas, in the view of other courts, the mere fact of such a communication will not be ground for setting aside the verdict, unless it be made to appear probable that prejudice resulted from it."

It is thus seen there is no well-settled, definite rule on the point raised by appellant as to the presumption arising from such an irregularity, if it be one, as that complained of. A great weight of authority can be cited, holding that the presumption is against the verdict from an unauthorized communication to the jury after retirement, while equally strong and respectable authority is to the contrary. This condition of the authorities should forcibly suggest, at least in capital cases, where any act has in fact operated to the prejudice of the defendant, that it be shown, and should induce the officers prosecuting for the state, where it is even alleged that a prejudicial irregularity has been committed, to show to the court below, and incorporate in the record, the facts which prove that no harm resulted to the prisoner, rather than to leave so important a matter to turn upon a technical legal presumption, not well settled. It will not be necessary to enter upon an analysis of those cases which hold that, when an irregularity is shown with respect to the jury, during deliberation, it is presumed to be hurtful to the prisoner, or of those which hold to the contrary, for this case may fairly be determined

upon its own facts, as they differ in essential particulars from most of those decided. Jurors in this territory, in the district court, are upon the panel at every term who do not understand or speak the English language, and by their side are those who do not understand or speak the Spanish. Fully three-fourths of those qualified for jury duty are Mexicans, with either a limited knowledge of the English, or wholly ignorant of it. Under such circumstances, the statute provides for an interpreter, who acts under oath, and who is an officer of the court, and through him the business is conducted in both languages. While it is not, in terms, provided that such an interpreter may attend the jury in its deliberations, yet the necessity therefor is frequently imperative. The record in this cause discloses such a necessity. It recites the facts as follows: "It was afterwards shown to the court that there were both Spanish and English speaking persons on the jury, and *that they were unable to communicate with each other*, and that the jury requested the court to furnish them with an interpreter. The defendant objecting to this, the request was at first denied, but afterwards, the request being renewed, with the statement that an interpreter was absolutely necessary, the official court interpreter was specially sworn, and sent into the jury-room, over the exception and objection of the defendant."

This case must stand on its peculiar facts. A jury was in deliberation without the power of communication with each other. All possibility of deliberation or agreement was thus cut off. The jury twice earnestly asked to be supplied with a medium of communication. An officer of the court, specially provided by statute to interpret evidence, was first sworn, and then sent to the jury-room. The presumption is, in the absence of the oath, that it was not to communicate *to* the jury, but only to act as the *medium of communication, and take no part in the deliberation*. He could not have been an embarrassment to the jury, for that body twice earnestly asked for his presence. The interpreter did not intrude himself upon the jury as a mere listener, but went by direction of the court, on the request of the whole panel. This case is not like one where, unbidden, a stranger goes into the jury-room as a spy upon the deliberations, or as an unwelcome intruder. Such a person might be a restraint upon that free interchange of opinion so important to correct results. It is not in this case shown, or attempted to be proven, that the interpreter said a word, or performed an act, inimical or prejudicial to the prisoner, or that any juror was restrained in the exercise of his duty, or in the slightest influenced by the presence of the interpreter. Acting under oath and the order of the court, the presumption should be in favor of proper action by him, rather than against it. Under the circumstances, we are not willing to hold the presumption is that he acted improperly and to the prejudice of the defendant. If this officer of the court did or said anything prejudicial, that is a fact for the defendant to show in the court below in the first instance.

The ruling in this case on the point under consideration is predicated entirely on the facts of the case, the composition of the jury, its inability to communicate within its own body in the absence of an interpreter, its repeated request, the official position of the person sent in, and his oath. Under such a state of facts, there is no presumption that he did or sought to influence the verdict, or did anything wrong or prejudicial to defendant. We do not express any opinion as to the presumption in other irregularities, arising from the action of one not sworn, or directed specially by the court. Juries, in capital cases especially, should be carefully guarded; but we cannot hold a rule so strict and technical as to often work a mistrial when juries are so constituted that they cannot communicate. Nothing but the most urgent necessity should excuse the court in sending, even under the situation in this territory, an interpreter to the jury; but such an urgent case existed in the court below.

As to the last point, we do not believe it was the legal duty of the prosecuting attorney to call the remaining witnesses. He had fully and fairly developed the facts before resting the case, and he was required to go no further. We find no error in the record. The judgment of the court below is affirmed.

HENDERSON, J. I concur.

### MOTION FOR REHEARING.

PER CURIAM. The defendant in this cause files a motion for rehearing, and urges a further alleged error on the trial below. The new contention is that the court, at a time when the jury was deliberating, made to and received communications from them in the absence of the defendant; also that the proceedings respecting the appointment of an interpreter to the jury were held in the absence of the defendant from the court-room.

The first question to determine on this contention is whether the facts shown in the record sustain the position argued. If, in fact, the defendant was in the court-room when such proceedings were taken, and such communication was not so held in his absence, then defendant's motion must be denied. It is necessary, therefore, to consider the record, which is as follows:

"*Territory* v. *Jasper Thomason*. (Murder. No. 757.)

"At the same regular term of said district court, on the eighth day of December, A. D. 1885, the same being the eighteenth day of said term, the following among other proceedings were had and entered of record: The trial of this cause proceeds, and again come the parties, the defendant being present by counsel as well as in his own proper person, the arguments of counsel are heard, and, on receiving the instructions of the court, the jury retire to consider of their verdict, in the custody of a sworn bailiff; and the jury request that they may be furnished with an interpreter, and the court, upon investigation, finding it necessary that an interpreter be furnished in order that the jury may communicate with each other, appoints E. V. Chaves as such interpreter, who is specially sworn to interpret between the members of the jury in this cause, and to keep secret their communications and investigations. *Now again come the parties*, the defendant being present by counsel as well as in his own proper person, and comes also the jury;" (and the record recites the return, at that point in the trial, of the verdict.)

This is the record as shown on four of the transcripts. The same proceedings are also shown in the bill of exceptions at page 38, as follows: "And thereupon the jury retired to consider their verdict. It was afterwards shown to the court that there were both Spanish and English speaking persons on the jury, and that they were unable to communicate with each other, and the jury requested the court to furnish them with an interpreter. The defendant objecting to this being done, the request was at first denied, but afterwards, the request being renewed, with the statement that an interpreter was absolutely necessary, the official interpreter was sworn," etc.

It is evident that these recitals both refer to the same transaction, and should be construed together, as they contain all the proceedings upon the contention involved. Counsel for defendant places special emphasis on the use of the word "afterwards." That word is used simply to denote that the request for an interpreter was later in time than the retirement; but does it therefore follow that the request came from the jury while deliberating in their room separate and apart from the court, rather than in open court, in presence of the defendant? As a matter of fact, the room in which jurors deliberate is often adjoining and immediately opening into the court-room, and it frequently occurs, especially when the evidence is manifestly clear and convincing, and so the return of the jury is apparently a matter of very short

time, that the prisoner remains in the court-room under the custody of the sheriff, and it may well be concluded that such was the case in this instance. The record really affirmatively discloses that the defendant was in court in person until after all the proceedings respecting the interpreter were taken. The instruction of the jury, the request for an interpreter, the fact of his being sworn, are, by a fair reading of the record, shown, as we think, to be one continuous act in presence of the defendant in open court. The record affirmatively shows the presence of the defendant when the instructions were given. There can be no presumption that he then retired; and that he did not, in fact, do so, but remained in person in court during all the proceedings respecting an interpreter, is apparent from the recitals in the record, especially in view of the statement therein "that the defendant objected to this being done." The motion for new trial presented for the consideration of the court below has been carefully examined. It nowhere states that the court communicated with the jury, either by message or otherwise, at a time when the jury was deliberating, separate and apart from the court. Neither does it state the interpreter was appointed and sworn by the court, and sent to the jury, either in the absence of the jury from the court-room, or in the absence of the defendant. If, in fact, the court had received a message from the jury while they were deliberating in some other place, asking for an interpreter, and the court had, in the absence of the defendant, considered such message, and determined to grant their request, and had then, in defendant's absence, selected such interpreter, and caused him to be sworn and sent to the jury, such a proceeding would, beyond all doubt, have so deeply impressed the learned counsel who so ably represents the defendant that it would have been made a ground in the motion for a new trial in the court below. The absence of such a cause in the motion confirms the view we have taken respecting the construction of the record on the point involved in this motion.

Upon a careful reconsideration, the motion for rehearing must be denied, and it is so ordered.